2008, 12-16, and 12-46, Mr. Dressen. The jury verdict in this case requires Molten to disgorge $8,054,000 in profits. Even though it is undisputed that Molten's annual sales of basketballs in the United States is only about $160,000. And Molten has never earned more than $65,990 in profits on U.S. sales of these particular basketballs. But is what it earned the issue, or is it the damages it inflicted on the other side of this issue? In this case, Your Honor, the damages, the plaintiff here, Botten, relied only on alleged profits of Molten in order to determine what it would receive in damages. It didn't seek to prove Lanham Act damages as such. It did prove Patent Act damages of some total of $38,000. But for the Lanham Act, it relied on alleged profits that Molten earned. So you've got alleged profits of, as I say, over $8 million for a company that's never actually had actual profits in this country of more than $65,990 for this product in sales in the U.S. That's grossly excessive and plainly warrants a new trial on damages. But it's not the only error that was made below. There were two others that would warrant broader relief. First, the Lanham Act judgment as a whole should just be thrown out outright because the claim that Botten made, as characterized by Baden-Bottom in this court, runs smack in the NASCAR. And second, even if you assume that they had a valid claim under the Lanham Act that the product wasn't really innovative as such, putting to the side whether it was Molten's innovation, a new trial would be required because the court below erroneously excluded testimony, both on cross and direct, that Molten's product was different than Baden's product and therefore innovative. If Molten misses discovery deadlines and files a witness list late, does that justify the exclusion of evidence? It justifies the exclusion, Your Honor, of the evidence that the court excluded on those bases. And I can certainly understand how it could frustrate the district court to no end, but it doesn't excuse the mistakes that the district court made during the trial, Your Honor. And there was evidence excluded. There was evidence excluded, for example, of prior Japanese patents that may have demonstrated to the jury that, in fact, the underlying patent of Botten's is invalid. What did you mean when you said innovative? What does the word innovative mean? What did you mean when you used the word innovative in your advertising? New or different, Your Honor. New and different. And that's basically the testimony that all the witnesses gave as to what innovative means. But doesn't that go to the nature and characteristics of the goods? Your Honor, it could theoretically go to that. We believe that would be puffery. You mean it could theoretically? It has to, doesn't it? Your Honor, yes, we believe it would be puffery if used in that way. But I don't think the court needs to reach those issues because on pages 48 and 49 of their brief, Baden unequivocally disavows defending the judgments below on that basis. It says without any equivocation that its claim doesn't have to do with whether the ball is innovative in general. It says what its claim is is that it's not Moulton's innovation. In fact, we can look at the actual quotes on page 48. What they say is Moulton presents the issue as though the words innovative or innovation stand alone in Moulton's advertising. That characterizes them as general. It's not accurate. There's a difference between using the word innovative alone comparing to modifying it to the possessive form Moulton's innovation. And they say there's multiple variations that collectively convert Moulton's advertising from a general statement that it's merely selling an innovative product to communicating this particular innovation as Moulton's. But once they've converted it to that latter phraseology, you're running smack into Daskar because Daskar explicitly prohibits running a Lanham Act claim based on who the inventor of the product is. Well, it seems to me you're putting a lot of emphasis on the expression Moulton's innovation. So you're saying you read that to mean Moulton's innovation, whereas the other side is saying, well, it's Moulton's innovation. Well, it's not what they're saying anymore, Your Honor. There was a dispute about that in the district court, and it's true the district court read it that way. But I don't think, with all due respect, that you can read what they're saying on page 48 and 49 in that way. They're trying to escape from puffery on those pages, so they're saying we're not talking about innovation as whether the product is just generally new. That's why they say the communication is this particular innovation is Moulton's. That's what they're after in order to escape from puffery. They did allege that there was some innovative technology involved in these little black strips in the seats, correct? That's right, Your Honor, and that goes to our second argument here today, which is even if you were to assume that the complaint was about whether the ball was just new and different, innovative as such, the way that they tried to prove that it wasn't innovative and therefore that our advertising was false was to have witnesses like Mr. Schickler, the CEO, come up and say this ball is an exact copy of our ball, therefore it can't be innovative. We then tried to cross-examine him as to what the differences are between the two balls in order to demonstrate to the jury that our ball could be innovative. We weren't allowed to do that. Next, they had their marketing expert, Mr. Yalch, Professor Yalch, come up, and they had him testify that if the two balls are the same, then it's false to say that our ball is innovative. We tried to cross-examine him, like, well, what if the ball is different in this particular respect, that our ball has a thick rubber seam, which is, by the way, the cushion, the dual cushion, it's the second cushion. They wouldn't let us ask him that question. Third, we promised the jury, I think it's on page one, I'll get it for you, it's in the opening, we promised the jury to transcript page 140, that they'd hear from our CEO, Mr. Nishihara, and he would explain the differences between the two balls. And yet, when we tried to, on direct, elicit that testimony from Mr. Nishihara, the court wouldn't let us do that. Now, the court made that mistake because having ruled that the claim survives DASCAR because patent infringement is different than innovation, it kind of forgot that. And so when it got to the evidence, the court thought that the finding it had made on patent infringement was dispositive of whether the new ball was innovative and meant that it wasn't. Now, that's plainly a mistake of laws. This court knows better than anyone. Infringing products have to contain all of the limitations of a claim. But they can contain more stuff. They can, nonetheless, be different and innovative and still infringe. And we tried to explain that to the judge time after time during these various testimonies, and the court wouldn't listen. That's prejudicial for two reasons. Of course, as we've explained, the Ninth Circuit presumes prejudice. But nonetheless, it's prejudicial for two reasons. First of all, given that their whole argument was we can't be innovative because our ball is the same as theirs, surely we should have been able to extract on cross and direct that our ball is different. Secondly, we know the jury was confused by all of this because they asked a question of the judge during trial. They sent up a question saying, why do they keep trying to prove their ball is different when you've already instructed us that there's infringement? So we know that all of this and these objections that were made and sustained during our attempts to ask these questions confused the heck out of the jury and didn't let us put on our case that the ball is truly innovative. So at the very least, we need a new trial here on Lanham Act liability. Now, the third of our issues here does go to damages. The model of damages that the jury followed, and we know it followed it because it followed it to the last decimal, is that our advertisements that our ball was innovative are what led the International Basketball Association, a federation with whom we've had a relationship for 20 years, but nonetheless, those advertisements are what caused FIBA to continue having a sponsorship agreement with us in the future through two new sponsorship agreements. And then they say you can take what we paid FIBA under those sponsorship agreements as a proxy for the profit that we made off of the false advertisement. Now, there's three separate, distinct, and each completely sufficient problems with that theory. Number one, this was a sponsorship agreement for the use of our basketballs in all international tournaments and in the Olympics. Plainly, the branding benefits from that use accrue worldwide. Most of the sales abroad? 99.1%, Your Honor. And under the Lindy Penn case, which is a Ninth Circuit case, it is unequivocally the plaintiff's burden to prove the profits in the relevant market. In that case, just to give you a little bit more meat on the bones here, it involved trademark infringement by BIC of Lindy Penn's pen. But the trademark infringement was only alleged on the phone sales. So Lindy introduces evidence of BIC's profits on all of that particular pen's sales. And the district court says, you haven't proved the profit, because the profit has to be in the relevant market, in that case, the phone market. And the Court of Appeals affirmed on that basis. Here, similarly, the profits have to be profits on sales in the United States. So proving $8 million worldwide and not trying to knock that down to what's in the United States, and Yalch specifically said he didn't try to do that calculation. Now, the patent infringement damages were what, about $36,000? $38,000. Does that tell us something about what the damages to so-called false advertising were? I think it tells you a lot about it, Your Honor. But we can be more specific than that. Their experts actually calculated our profits on U.S. sales of this particular basketball at $65,990, which is what we say the remitted error would be towards. Now, there's two other problems with the damages I'll just go through quickly. One is that— If you want to argue about them, you can use it in the course. I assume you're going to raise things that are in your brief. Okay. Your Honor, then, with that as advice from you, I will take it kindly and reserve my time for follow-up. Thank you. Case and resumption. Good morning. I'm going to take my time today talking about the restart damages. At least our problem relates to the difference between Section 43A1A and Section 43A1A. I want to ask about the media. The media doesn't necessarily distinguish between U.S. and abroad. And the authority the court cited for advertising expenditure as a justification for damages in the U of R case seemed to me to be fairly limited and cited a connection between the revenue growth and the advertising, which hasn't been shown here. So why shouldn't this go back to the trial of damages? Well, let's walk through this step-by-step. Let's walk through the points of agreement so that we can get to the points of disagreement. And the points of agreement are, first of all, there was a finding of intentional false advertising in accounts of jury verdict. That doesn't seem to be on here. That's liability. That's liability. That's what we're talking about, liability. But the second— That was a question of damages. Right. You can go back. Right. Well, there's a backward component. There's a forward component. The $8 million is the forward component. That relates to the financial benefit the moment is going to receive from future sales. That's where the $8 million comes from. The backward component is all the sales that were made, you know, prior to trial. Those were the numbers of basketballs that we knew about at the time of the trial. And that's what Professor Yost testified to. But in terms of the forward going, you say $8 million benefit. That's forward going. Forward going. That's forward going. But $8 million benefit came at an $8 million price tag. So that puts you at a zero profit to start with. No, that's the zero sum argument. This is a false advertising case. And so it's fundamentally different from a trademark infringement case. If it's a trademark infringement case, then you've got numbers of products that you can look at. You've got a top-of-the-line revenue number. And then you've got cost numbers below that. And then that's going to establish your incremental profit. Wasn't NPR, wasn't your argument here for damages based upon profit? It was based on disgorgement of profit, disgorgement of financial benefit relating to the wrongful conduct. So the question is what does the evidence show in terms of Moulton's profit due to activities in the United States? The evidence shows what this is about is the hypothetical that I think about is a Super Bowl ad. It's because somebody runs a 30-second Super Bowl ad because they're about to launch a new product. And that Super Bowl ad is intentionally false and malicious. It's presumed that it's taken off once, like many Super Bowl ads, and the next day the product was out the door. And so the intent of the Lanham Act was to deter that kind of conduct. And to deter that kind of conduct, you have to come up with some sort of benchmark for an award of the financial benefit that's received from that wrongful conduct. What's the link, what's the connection between sponsorship and worldwide leagues and the false, and the use of the word innovative? Well, here's the connection. This is a trial exhibit. This is exhibit number 20. And this is a FIBA advertisement. And Professor Yost has talked about this. This is a FIBA advertisement. And it falsely advertises that dual-cushion technology is a molten innovation. And then the question is, how did molten pay for this? Molten paid for it via the FIBA sponsorship agreements. So then what else does the FIBA sponsorship agreements give to molten? I'm still listening. What's the connection between the use of the word innovation and their $8 million? $8 million they get from worldwide. The connection between innovation and the $8 million is that molten came out with a new innovative asset. They'd only have gotten this sponsorship if they had used the word innovation. There is evidence in the record that they would not have received the sponsorship but for the innovation. There is evidence in the record. It's right here in this document. Now, causation, what you're really referring to, Your Honor, is causation. But for the use of the word innovation, they would not have gotten sponsorship, even though they've had it for 20 years. Well, I think ultimately that's the question now. Now, let's look at innovation. Could they have said, instead of the innovation in basketball, could they have said the new and improved basketball? There are lots. There are many different variations. Could they have said, we have a new and improved basketball? Could they have said, we have a new and improved basketball? It's, you know, I'm reluctant to analyze all. I think you're in trouble if you say anything other than, I just think it's right. I would say my reaction to that would be, yeah, I think they could do that. I think they'd be free and clear of land on that claim. I don't think there'd be anything necessarily false about that. Then it seems to me you do run into death star, don't you? The only thing you're adding to that sort of puffery in their innovation claim is that they, in fact, were the innovator. No. That's patent law and not compensable under the Lanham Act. No. Daystar is, it creates a different issue. Daystar is... In simple terms, we're not going to use the Lanham Act to compensate for patent problems. In simple terms, we're not going to use the Lanham Act to protect ideas. In simple terms. That's true. And they can use the word innovative to mean new and improved, new and different, new and fancier, whatever their new sort of puffery is. They can do that. So you're saying, really, the thing you're seizing on is that they weren't the innovator. That's patent law. That's patent law. There's no reason why there cannot be a Lanham Act claim that relates to patent issues at the same time. Justice Scalia left that door open. Show me where he left that door in Daystar or Death Star. He left that door open for various reasons. Okay. I've got it right in front of me. Show me where the door is open. Because I don't find that door being very wide at all. The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device. That's the purpose of patent law. It's at the very end of his... I just read it from one part. It's at the very end of his discussion. It's at the very end of his discussion. After, he walks through an analysis of Section 403A1A. And this is how he walks through that analysis. First, he reads the statute. Then, you know... He was dealing with origin instead of innovating. Absolutely. But it's pretty similar. Absolutely. Well, it's not similar because the trademark prong of the Lanham Act is different from the false advertising prong of the Lanham Act. There have been courts that have held that they're essentially two different causes of action. They're not the same. You can't consider them as trademark prongs. We're not protecting the source of the goods. That's true. We're talking about false advertising. We're talking about wrongful statements, false advertising. But they can use innovative to be new and improved. We all agree. So, the only thing you're really saying they offended is by saying, we multiple made these innovations. That's correct. What we're saying is that Biden developed this technology. Of course, it was very important. Why doesn't that fall right into this? The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device. Well, I think of the ads... It seems to be right on the day stone. No, no. I think of the ads that I've seen where the word patent is advertised. And you see that quite a bit. What's the purpose of putting that in advertising? Well, the purpose of it is to influence consumer purchases. You don't see patent in advertising for the purpose of conveying to consumers some threat of infringement. It's there for another reason. It tells consumers that there's something new, there's something unique about it, so on and so forth. So, presume that there's a company that is doing that sort of advertising, but it has absolutely no patent at all. None. Is that prohibited by Daystar? No, it can't be. And that's the difference between Biden's claim and Daystar. And that's the difference between the trademark crime of the Lanham Act and the false advertising of the Lanham Act. Now, what Justice Scalia did with Daystar was he went to the statute first, and then he went to the dictionary, and he interprets the word origin, and then he goes back to the statute. And he finds, well, what is the natural meaning of origin in the context of the statute? And in the context of Section 43A1A, he says origin means the company that stands behind this product, basically the trademark owner. And you can't have upstream parties making claims to be the origin of a product under Section 43A1A. Now, a trademark infringer, a false advertising claim, is a completely different animal. And so if you walk through the same statutory analysis, the statutory language is different from a false advertising claim. And it probably hinges on the interpretation of the word characteristic. The definition of characteristic is a unique element or attribute, something like that. Now, if you take that and you look at the statutory language, you have to ask the question, what is the natural meaning of that word in the context of the statute? And the natural meaning is it's some word that influences consumer purchases. So we have an expression or a use of wording that influences consumer purchases here in some way. And yes, yes, we do. When we have one company that comes out with a piece of technology and it's in innovation and it's promoted as innovation, then... And you've got your damages for that. You've got your patent damages. Those are in your pocket. You can walk away with them. How does that justify you bringing a separate claim for false advertising? Well, it goes back to the example that I gave in the very beginning. Imagine a Super Bowl ad that has intentional malicious expressions and that sort of thing in it. It stops, and then the product gets sold off that ad subsequently. What do you do about that situation? You have one of two choices, you can say. You assert that the only thing that's false and malicious here is the patent attribution. Who invented it? Who innovated it? And you've got your damages for that under patent law. So unless you can show me some other way in which they maliciously, at the Super Bowl, advertise their basketball, I think you've got trouble. Well, the problem is that what Moulton is trying to do here is... Clearly, the word innovation was important to him a lot. Innovation, innovative Moulton technology. Moulton's innovative technology. There's no question that that was an important issue. So what's happening here is innovation is sort of like idea, and we know that the Lanham Act can't protect ideas. So we're trying to pigeonhole this thing. You just haven't told me what you are protecting other than... What was the false advertising? Since we all agree they can say new and different. What's the false advertising, if not the attribution of who invented it? The false advertising is Moulton's innovation. The dual cushion technology is... Moulton did it, and they really didn't do it. That's your point, right? Moulton is advertising. It's their technology, and they really didn't do it. Didn't do it. That's patent law. You've got your damages for that. Now, tell me what else they did. Well, and one point is the problem is that you can't just say somebody uses the word patent in advertising, or somebody uses the word copyright in advertising, or something like that. They automatically get a free pass under Daystar. You can't open the door to intentional false advertising that's done by characterizing it in terms of patents or copyrights or something like that. Daystar doesn't go that far. Now, the causation here is Moulton comes out with this new basketball. Moulton uses that to do a deal with FIBA. The FIBA agreements are directed to the basketball market. The U.S. basketball market is the largest basketball market in the world. Moulton does a side agreement with the U.S.A. basketball team. That puts the Moulton basketball in the hands of prominent sports stars, and that's the link from use of Odden's innovative technology and advertising it all the way to— Can we use this to challenge the results of the 2004 Olympics? I'm sorry? Can we use this to challenge the results of the 2004 Olympics? Challenge the results? You mean who won the gold medal? Yes. No, no, no, you can't go that far. Sorry to hear that. But what we can do is we can use this to challenge the financial benefit that Moulton received from its false advertising, particularly when its false advertising was intentional. Mr. Kraser, I think you're in overtime. Can I blow the whistle? Thank you. Mr. Kraser has some rebuttals. Thank you, Your Honor. If this Court has any questions, I'm happy to address them. And if not, I'm happy to see my rebuttal time, and then we can all go to lunch. What do you make of the comment on the $8 million being a foe again? It's actually incorrect, because the two agreements that were signed, one was signed in 2002. It was an agreement that went from 2003 to 2006. The other agreement was an agreement that went from 2007 to 2016. Certainly the first of those two, which added about close to $3 million towards the $8 million, has to be backwards looking because it's already over. And so that would have to be encompassed. Well, we bounced around the issue pretty well. It's basically not a slam dunk. Thank you, Your Honor. All rise. The Honorable Court is adjourned tomorrow morning until 10 o'clock a.m.